May it please the Court, my name is Carrie McConaghy-Nolan from the Nolan Law Firm, on behalf of Mr. Gino Carlucci, who is not present today, Your Honors, as he is in custody of the Federal Bureau of Prisons in Latuna, Texas. I today will take 15 minutes of time and attempt to reserve five of those for rebuttal, if the Court allows it, and Mrs. Tara Hubland is here on behalf of Mr. Mounts, who will take the other five minutes of time, and I believe she would like to retain a minute or two of rebuttal as well. So you want 15 minutes but five of rebuttal. Yes, sir. So 10 minutes argument and five rebuttal. Yes, sir. She wants five and one of those rebuttal. Yes, sir. Well, guard your time, because if you run out and you take into her time, that's the way it goes. Okay, Your Honor. Okay. Yes, sir. I would like to just start quickly. There are a lot of issues here. I think that there are a lot of really good issues here. So I would first like to jump right into the first two issues, which are interrelated, one and two, which are the immunity question and then the plea agreement as well. So they go together. And I just would like to make sure that the Court is aware what the defense is arguing, and I think what is most important is that this is not a situation where it's a typical proffer agreement that was made, a plea agreement that came out of it, and then the matter is finished. This is a situation where a proffer was made and a plea agreement entered back in 2004, which required continuing cooperation, which is what Mr. Carlucci gave to the United States government for years, as a matter of fact. That trial did not go until September of 2009. What's the strongest evidence that he – that the government represented that he would receive immunity? The strongest evidence is twofold. First, the – Jeffrey Wright, the investigator for the defense attorney who was working on the case, who sat in on all the various meetings there. On top of that is also the fact that Mr. Carlucci was not talking to just the two United States attorneys who were in Nevada in that case. He was talking with Mr. Rawling in particular and the other attorney who were going to be eventually prosecuting him in the State of Arizona about this matter in Ohio. And they even stopped one of those meetings where Jeffrey Wright specifically acknowledged and said, wait a minute, let's make sure that this is all part of the cooperation agreement. And the two U.S. attorneys who were working on the case in Utah, in particular Mr. Mayfield, who is the subject of a lot of the conversation in the briefs, and who left the Attorney General or who left the U.S. Attorney's Office, not necessarily on great terms. Kagan But unrelated terms, right? Completely unrelated terms, yes. He did not specifically say to Mr. Carlucci, you have immunity in the State of Arizona or you have immunity if we try to prosecute you in any other jurisdiction other than Utah. But he did say, you have to continue to cooperate with us. So there's no question about the fact that Mr. Carlucci was informed that this was all part of what he was continuing to have to do. And I'm going to the 2004 agreement. Pursuant to the 2004 agreement. Is it your contention that something he said during the course of those conversations was used against him? Yes, Your Honor, yes. And I have it highlighted in the brief. In the opening brief on 32 and 33, we talk about the things that were used. The search warrant affidavit for the large boat that was seized from the Valero residence. That was based on the conversations with Mr. Carlucci during these cooperation in preparing for trial. And then there's the other evidence that was presented by Agent DeSalvo, I believe, at trial, who presented some very damaging evidence that was evidence that didn't exist anywhere other than what Mr. Carlucci had said about him being involved with Mr. Garback or him being involved with Mr. Flickinger and things like that. Do I owe any deference to the district court in their factual, in the district court's factual determinations as to this issue? Sure, Your Honor. I understand that there is that deference that must be granted, but if you look No, no, no. Just a minute. If I do owe the district court deference, what is the deference? Don't I only overturn the facts the district court found for clear error? No, Your Honor. We disagree that it's a clear error standard of review on this. We believe that this should be a de novo standard of review. How come it's de novo if all I'm looking at are the district court's determinations of facts? I'm not suggesting that I'm going to use, though I'm not suggesting it isn't factual. At this point, I'm not suggesting that I'm going to use the district court's final determination on those facts. But at least as to the facts the district court found, it seems to me that district court was there. The district court reviewed what was going on, and I owe deferences to that. I would, I can And therefore, if I owe deferences to that, then I'm having a tough time why what the district court found as the final conclusion is wrong. Your Honor, I can agree that factual determinations are normally given that deference. The case law that we cited talks about the de novo standard of review. So I recognize that that's maybe, it could be either one. But at the same time, if you give the facts a deferential standard here, we still have a legal part of this that is incorrect. And that is Just a minute. Your only legal conclusion is that looking at the facts the district court had in front of it, you come to a different result than does the district court based on the legal premises of a contract, if you will, that I should approve. But if I look at the facts here, the district court was pretty clear, wasn't it? Nobody expressly or implicitly represented that he would have immunity. That was the fact. And Your Honor, that was the facts that the district court found. Three days of testimony. Yeah. Listening to everybody, having a chance to determine whether they were honest or dishonest, knowing whether they'll lie or not lie. And now he's had all this. He's got that all in front of him. And he's listened to the witnesses and he looked them in the face, as I had a chance to do in my former life. And he made a determination. So my worry is that based on his factual determination, I don't see any way to undo it. Because, Your Honor, what the factual determination was is a little off from where the law is in the sense that it was not expressly asserted that he had immunity, but he was expressly forced to continue cooperating pursuant to the written documents that he had. So his Fifth Amendment rights were never read to him. They all agreed on that. And again, they all agreed that at least one of the U.S. attorneys had said that he had to give them everything that they were asking about as part of his cooperation agreement. And the plea agreement, again, going into that, Your Honor, is also that legal part of it that the U.S. Attorney's Office requires that they have that clause in the plea agreement saying we are retaining the right to prosecute you elsewhere if we want to. And that clause was missing from this plea agreement. All right. And the cases talk about that. I understand where you're going, and so let me ask you one other question, which kind of dovetails into what my colleague asked you. I'm still having trouble seeing where the government used any of the information it obtained regarding the 2009 stem genetics discussions as a result of its representation against your client. And, Your Honor, they did not use any of the stem genetics. That's agreed. What they used was the information they were forcing Mr. Carlucci to give them regarding the matter that they were going to prosecute him for later. So they flew in and were asking questions about the separate matter that had nothing to do with that. And the representation was that pursuant to that cooperation agreement in stem genetics, he needed to answer the questions on all of this other material. And it's all the other material there. Did he have an opportunity to consult with counsel about that? He – that's a – there's a little bit of a question about that. And the – Well, I read – then you'll need to tell me, because I read that he did have the opportunity, and then his lawyer said, go ahead and answer the questions. What – so please correct me. He did – his – the – Jeffrey Wright, the investigator for the defense, was there at the meetings and said that, in fact, they stopped a meeting one time. Right. He talked with counsel. Counsel then talked with Mr. Carlucci and said, absolutely, you have to cooperate. This is all part of the agreement. Right. That's what I read. So that sounds a whole lot like he had the opportunity. Yes. To consult with counsel and chose to go forward. So what am I missing? So just that the district court judge looked at that and said, how come your attorney hasn't come here to tell me the facts, Mr. Carlucci, when they were having the hearing on this? Well, but even pursuant to your presentation and representation today, actually, not to mention before the district court, there seems to be no question he had the opportunity to consult with counsel to determine whether or not he really was obliged to continue to cooperate pursuant to the 2004 agreement. Right. And he certainly believed that that was all part of those agreements, that he had to keep giving this information regarding this case based on the stem genetics agreements that he entered into, the plea and the proffer. And so it's your position that the government was overreaching? Yes, absolutely, Your Honor. The government made sure that he knew he had to keep talking, he had to keep answering these questions. And part of that is established in the government's changing of the way it has argued this throughout. It started out saying at one point that Mr. Carlucci wasn't telling the truth when he was giving all the information to them during those preparation hearings. So that's why they went ahead and prosecuted him. Then it turned into that they offered another reason, and before they moved into now what they're arguing, that Giglio, Giglio information wasn't issued. So we disclosed to the other side up there, and then we were allowed to go and impeach him with this, but there wasn't really any agreement. We were just impeaching, inquiring, and trying to get him ready for impeachment. So they've changed their analysis of what exactly happened, whether there was any agreement or not. And also there is the part that's quoted in the opening brief where when these hearings started, and again there were three in the district court, the motion to dismiss, the prosecutor represented to the district court, because the district court said, hey, this looks like an immunity agreement. This looks like orally he was told he had to participate and agree. And the AUSA, Mr. Rawlings specifically stated, we're not bound by what another attorney in the U.S. Attorney's Office does. And the judge was taking issue with that. There was a little debate about that. So, I mean, their position has changed throughout so that they're at this point saying, oh, no, there was never any immunity agreement here, but in fact there was. And, again, it was clear in the sense of the oral parts of this in that legally the law is that if it's unclear in the documents themselves, you have to – this has to inert to the defendant's benefit. And especially where here we have so much evidence that shows that he was specifically told, keep cooperating. But again – Okay. So that's why my first question was, what's the strongest evidence that there was an agreement that he would not – that he would receive immunity? And the best you've got is Investigator Wright? Jeffrey Wright, yes, ma'am. Okay. Yes, thank you, Your Honor. Okay. You've kind of eaten into your rebuttal time. I think you better give your counsel some time or she won't get any. Thank you, Your Honor. Good morning, Your Honors. You may please the Court. My name is Tara Hovland. I represent Appellant Wayne Mounts. The sole issue in Mr. Mount's appeal is whether his constitutional rights were infringed upon by repeated instances of jurors sleeping during the trial, more specifically, at what point the sleeping jurors rose to a constitutional violation and at what point the trial court was compelled to remedy the situation. To determine this, reviewing courts look to prejudice. Did the defendant receive a fair trial? The test seems to be, did the jurors fail to follow some important or essential part of the proceedings? Did they miss large portions of the testimony or particularly critical portions of the testimony? Well, before you get to that, because I think those are all important issues, what is my standard of review in this particular situation? Abuse of discretion. Why? Did you ever object? Did I check for abuse of discretion? Did you object to... Oh, I'm sorry. Yes, Your Honor. In the manner in which the court dealt with any juror. We're asking for this court to review for plain error. Did you object? The trial counsel did not object. No. Okay, so the trial counsel did not object. So what is my standard of review? Plain error. So I have to review this on plain error review. First of all, how the court deals with a juror falling asleep is abuse of discretion. Correct? Yes. And in this instance, not only are we talking about abuse of discretion where the trial court may do something that we wouldn't have done, but we're saying in this case, it's not just a matter of was it something we wouldn't have done, but was it so bad that it is prejudicial? Isn't that what we're saying? That's right. Okay. Did you not participate in the discussion of how to handle the first juror to your counsel? For example. Yeah, Mount's counsel. Sorry. The government's instinct was correct. The government wanted to replace the two sleeping jurors as alternates. But Mount's counsel wouldn't allow it. That's right. Said, no, we want them. That's correct. In fact, Mount's counsel objected to use them as alternates. Yes. I'm sorry. That's okay. I interrupted you. So for today, because there were two notes to the judge. So for today's purposes, given that the standard of review is what Judge Smith just went over with you, are you objecting as to that first incident, the first note or just the second? I'm objecting as to both because I believe it was an ongoing problem. I understand if the court considers the first one waived. Exactly. Can you focus on the second one for me? Yes. And the second one is where the real problem lies, because it happened two days later after another 13 witnesses testified, where the juror sent another note saying, look, I've seen this other juror sleeping again. And Mr. Mount, in his closing argument, talking to the juror, said, Mr. Mount's defense is based on the testimony of several witnesses, and I'm hoping you paid particular attention to my cross-examination of those witnesses because it went specifically to the elements of the crime. And he specifically noted the knowledge element of count one. When you look at all of the witnesses that testified over the days that jurors were cited as sleeping, those are critical witnesses to Mr. Mount's defense. There were 25 witnesses. The case was mostly heavily weighted toward Mr. Carlucci. And asking the juror to look at the defendant, the jurors to look at the defendants separately was a difficult enough task as it was without having a couple of jurors sleeping during two or three days of the trial. We don't know that they were sleeping during two or three days. We had these snippets, right, these sound bites of testimony or indications. We weren't in the courtroom. We were talking to three former trial court judges. And so under this standard of review, how could we possibly get there? Well, you have the juror sending the second note saying that the juror was sleeping again. You have this plain error standard of review that you have a note that went that was never discussed on the record. So you have clear error. And then you have the public reputation of the proceedings. Forgive me. The clear error is that this note was seen by all the counsel and it was never discussed on the record as to what to do toward the end of the trial. By anybody, including defense counsel. There was no request. Yes. Right. So to be more specific, how do I know what, if anything, the jury missed? Just by looking at the witnesses who testified during those days. And assuming that they were slept through the whole thing? There's no other way to do it because the district court never questioned the jurors to find out exactly which portions they missed. My worry is that you've waived it all. I mean, here's the judge. He said, this is what I intend to do. You objected to using the misalternate. So I did exactly what Mount's counsel wanted him to do. And he said, and I read from the record, I will consider any ideas counsel has on how to remedy the problem. And not one thing was said. In fact, deafening silence. I would respond to that, but that was on day four of the trial. Oh, I know when it was. But if I were sitting there, having been counsel at trial, and the judge says, I'd want to know if you got any help on how to deal with this, I'd have jumped up and said something rather than coming in now and saying, well, now, it was so bad. And I am supposed to, you are supposed to, as a Federal judge, appellate judge, look at that record, snippets, as my colleague has suggested, and say, there's plain error. Well, thank you, Your Honor. I want to reserve the rest of the time. Oh, you don't want to answer that? Well, I do. I believe that the Court had a continuing duty to protect the constitutional rights of the defendant, regardless of what the parties asked for. And there is case law that says that he had independent authority to do so, regardless of whether the parties consented or not. So that is our argument on that point. So is your argument, just if I could one more, is your argument that it was plain error to not at least inquire, to figure out whether the jury did miss significant portions of the testimony? Exactly. Yes, Your Honor. Thank you. Thank you. Your Honors, may it please the Court, Joseph Severson for the United States. I'd like to begin by sort of clarifying the what actually happened with respect to the facts pertinent to the immunity issue here, because I think that Mr. Carleach's counsel has misrepresented those facts in material ways. First of all, it's important to keep in mind that there were two separate cases here. There's the case that we have before us here, and then there was the STEM Genetics case. These are unrelated cases. The STEM Genetics case involved a boiler room securities fraud scheme. These cases are unrelated. In December of 2004, Carleach entered into a plea agreement with respect to his participation in STEM Genetics. He agreed to cooperate with the government in that case. Later, February 2005, or February 17, 2005, the prosecutor and the case agent were investigating this case that led to the case that we have here, asked to meet with Carleach. And this is the only time there's any indication in the record that the case agent here, Agent DiSalvo, or the prosecutor who prosecuted this case, Mr. Rolling, met with Carleach. During that February 17, 2005 meeting, there was a separate proffer agreement that was entered, precisely because we have two different cases involved here. So that separate proffer agreement identified the subject matter as the government's investigation of Joseph Flickinger. And that proffer agreement did not give Mr. Carleach a sort of transactional immunity that he's claiming here. All the statements that the defense pointed to in the record, claiming that these in the course of his cooperation with government that was used against him in this case, the only thing they can point to is evidence of statements that he made during that February 17, 2005 proffer session, which was conducted under the auspices of this investigation that led to this case, not the STEM Genetics matter. Four years later, August 2009, after the investigation of this case has been ongoing and there's been a grand jury's convened and evidence gathered, the prosecutors in this case, at the request of the STEM Genetics prosecutors, provide information about Carleach's involvement with Flickinger and the conduct that the form of the offense is here. They did that because the government believed correctly that it had an obligation to disclose that information to the defense of another STEM Genetics defendant that Mr. Carleach was going to be testifying against. Then, later in August 2009, there was a preparation session to prepare Mr. Carleach for his testimony in the STEM Genetics case. Now, in that session, nobody, you know, none of the prosecutors who prosecuted this case participated in that session. The only AUSAs who were there were AUSAs Hirata and Mayfield. They had no involvement in prosecuting this case. When you say this, now you're talking about? The present case. This case, Your Honor. Thank you. It's just important to keep things straight. Yeah. Okay. I'm trying to keep them clear. Oh, you're doing well. Okay. Press on. So they questioned Mr. Carleach about this material, anticipating that he'll be cross-examined on it when he testifies at the STEM Genetics trial. Now, in fact, during the session, Carleach actually did not, during the preparation session, the August 2009 preparation session, Mr. Mayfield testified that Carleach denied any wrongdoing in connection with the activities in this case. And we're talking our case. In our case, correct. Moreover, none of the information that Carleach gave during that preparation session was provided to the prosecutors in this case or the case agents. None of it was relied upon, well, none of it was provided to them before the indictment was issued in this case. None of it was relied upon to bring about the charges here. And that's why you argue that even if all of that is so, none of the information has been used against him. That's correct, Your Honor. Even, you know, even if everything else they argue is correct, which we don't think it is, you know, a premise of their argument is that the information that Mr. Carleach provided in the course of his STEM Genetics cooperation was used against him in this case. And there's absolutely, you know, there's absolutely nothing in the record that supports that proposition. Well, counsel, I just asked your opponent that question. She said that the information that was used that came from that interview had to do with the boat that was found in the driveway. Did you? So if I understood, if I understood counsel's contention correctly, she was saying that that information was used to get the affidavit for the search warrant. So there was a boat that was purchased with the proceeds of the fraud here. Right. It was hid in the home of Brandon Valera, a friend of Mr. Carleach's. The government seized that. So the government seized that in May of 2007. The preparation session here took place in 2009. So I don't see how it's possible that that information was, that the information that he provided in the 2009 preparation session was used to support that, the affidavit for that warrant in 2007. The other parts of the record she points to are testimony, she pointed, I believe, to the testimony of Agent DiSalvo. I was going to say, what about DiSalvo? DiSalvo testified about some of the statements that Mr. Carleach made during the February 17, 2005, proper session. And that's it. Those are the only statements that Mr. Carleach made to the government that Agent DiSalvo testified about at trial. So, again, not used against him. Is that what you're saying? That's correct, Your Honor. Well, I think that's important for, that's why I wanted you to go through that. And I want to hear what she has to say, if anything, in rebuttal, because I think that's important. I mean, even if all of that she says is true, then there's that. What really happened? That's why I think that was important, and I was glad you went through it. Counsel, did the government, opposing counsel also represented that the government took the position that U.S. attorneys in one case weren't bound by promises made by U.S. attorneys in another case? Is that right? That's not the position that, that's not the position that the government took. Well, I'm glad to hear that, but my first question is, was that representation made? I don't believe. I mean, to the court, in response to the district court's question. I don't believe that that representation was, I don't believe that that representation was ultimately made during the, during the December 1st, 2010 hearing. At any rate, that would have been on record. Yeah, there's a, I mean. Right. So to be clear, then, I mean, since we've got a record of that one way or another, that is not the government's position today. That is not the government's position. Thank you. I think the government's position here, again, is that there wasn't any, you know, there wasn't, there wasn't any promise. No contract was formed. That's correct. All right. Are there other issues you want to address, counsel? We did have some. Mount's counsel talked about the juror falling asleep issue. Yes, Your Honor. What about her point, which seems to me to boil down to the fact that there have been a couple of different examples of, after all, this wasn't something that one of the lawyers ginned up. There was a note passed to, well, two notes passed to the district court, and I think her argument boils down to being that it was plain error for the judge not to at least inquire about what was missed. Well, I don't think that that's, I don't think that's the case on this record, Your Honor. I think it's important, well, first of all, as Judge Smith said earlier, you know, we believe that this issue was waived completely. But even if you don't, even if you don't agree with that. Well, I just think that's her response, so. Yeah. We don't think that that's plain error here. I mean, but I think that is, I think that does tie together. Because even if it's not, even if you don't think that it's waiver, you know, with respect to the second, with respect to the second note, with respect to juror number eight, then I don't, I still think it's, I still think it's relevant that Mount's counsel took the position that he did when the issue was raised in the first instance. And first of all, he said that, he said that, you know, he didn't, you know, he just categorically objected to the replacement of those two jurors. Yes, but her argument today isn't about replacing them or using them as alternates. Her argument today is that it was plain error after the second note to not at least inquire. Well, but, I mean, the whole point, Your Honor, of inquiring about that would be presumably to determine whether they should be replaced with alternates. Well, first, to figure out what they missed, right? I'm sorry, Your Honor. I think her position is the judge didn't leave him or her, I don't know, the judge didn't leave room to figure out whether or not one of the jurors may have missed significant portions of the testimony. We don't have any record about that. No, we don't have any record, and that's because Mr. Mount chose not to make a record. Well, her argument, and I'm just trying to get you to respond to her argument, her argument is that the district court had an obligation to ensure that the defendant received a fair trial so that the court erred by not inquiring. What is your response to that, please? Well, again, I don't think that they erred, you know, under the circumstances of this case. First of all, the district court was already told, counsel, that, you know, objected to removal of these jurors. The juror note, the second juror note, was provided to counsel. If Mr. Mount's counsel wanted to revisit that position, he could have. Second of all, you know, it's not the case that the district court was simply blind to the issues of juror retention as we, in attention, as we detail in our brief. You know, when the issue first came up, the district court took a number of steps short of substitution of alternates. Right. And what about the second note? That's what I'm really getting at. When it came up a second time, was there no duty to inquire? Is that the government's position? I don't think that there's an affirmative – I don't believe that there was an affirmative duty on the part of the district court to sui sponte, make an inquiry here. And in any event, the posture here is plain error. So not only would it have to be that – was there an affirmative duty, but was it clear and obvious that there was an affirmative duty to do that and that the district court disregarded that? I don't believe that – I don't believe that Mr. Mount's has pointed to any authority that would suggest that there was a clear and obvious duty on the part of the district court, notwithstanding the previous representations of Mr. Mount, that he didn't want the – you know, he didn't want the jurors replaced with alternates, that the district court had a duty to disregard that. When the second note came up and in sui sponte, conduct a hearing, you know, Mr. Mount cites to this Court's opinion in United States v. Barrett, I believe, to try to support the proposition that there's an affirmative duty on the part of the district court to – to sui sponte, raise this sort of issue. But the Barrett case didn't stand for that proposition. Barrett involved a situation where there was a juror who was sleeping. And we know in Barrett, because the juror told her, you know, have good reason to suspect it, because in Barrett, the juror said and told the court, I'm sleeping. Please remove me from the jury. The district court refused to do so, saying, among other things, that they didn't believe that it had the authority to remove the juror at all, unless both parties agreed to the removal. In Barrett, this Court clarified that the district court didn't need the permission of both of the parties to remove the – to remove the juror under those circumstances. It didn't say that even when nobody objects and when – and when counsel for the defendant has previously disclaimed any desire to have the juror removed, that the district court nonetheless has to – has to inquire on its own. So even if you were inclined to think that that was error, I don't think it's clear and obvious error under this Court's press. Well, isn't it a question of degree? Isn't the problem that even if that's – that gets triggered at some point, depending on the egregiousness of the situation, that we don't have a record that allows us to figure out the extent of the problem? Well, again, and I mean, to the extent that there's deficiencies in the record in that regard, here, because we're on plain error review, it's the defendant who – who suffers on account of that, because here, it's the defendant's affirmative obligation to prove – to prove that his substantial rights were violated. I think you've answered my question. Thank you. Anything else, counsel? Your Honor, if the Court has no further questions, we'd ask that you affirm the judgments of the district court. Thank you very much for your argument. I think we've got about – not quite even enough to give you all of your rebuttal, but we've got a minute. Your Honor, just briefly, touching on the juror sleeping, I would assert, and Mr. Carlucci has in his opening brief, that, in fact, this is the duty of the judge sua sponte in a situation like this, and it is distinguishable from any of the cases. Well, but just a minute, sua sponte. Come on. If you're not going to object, what case is it that says there's a sua sponte determination for the court to inquire? And even if that is the case, on plain error review, why is this outside of what justice might allow? Irvin v. Dowd. That's the best one? In re winship. Those are your – in re winship doesn't speak to this. This is an actual liberty. We don't know what the jurors heard or didn't. These were jurors who were actually sleeping. But that's the problem, counsel, because we're just an appellate court, right? Absolutely. We're just an appellate court. And so, of course, the eyes and ears in the courtroom that could have figured out whether or not, you know, as I said, how egregious the situation is or not, we just don't have that here. Your Honor, and that's why it is the duty of the court in a situation where it's that extreme, where they have no – Well, but we don't know if it's extreme. That's the problem. So I think to rule your way, we would have to trigger this duty on the part of the court any time there's any indication that a juror's – No, Your Honor. Here – there was specific talking in the record that cited in the briefs about how they're actually sleeping on multiple days. This isn't just nodding off a little. Two days. And, of course, in response to the first day, the defense counsel jumped up and said, don't use those jurors as alternates. It really puts us in a tough spot. I don't mean to belabor the point, but – Thank you, Your Honor. And your time is finished. Thank you. May I just address the factual aspect? No. Your time is over. Thank you very much. You determined to go on the sleeping juror, and you used your time. Thank you, Your Honor. All right. This case is then submitted, and court is in recess.
judges: Fernandez, Smith, Christen